IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CHRISTAL KING, | ) | CASE NO. 1:15-CV-01056 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | **MEMORANDUM OPINION & ORDER** |
| | ) | |
| Defendant. | ) | |

Plaintiff Christal King ("King") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her applications for Social Security disability benefits. Doc. 1. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned Magistrate Judge pursuant to the consent of the parties. Doc. 13.

As explained more fully below, the Administrative Law Judge ("ALJ") failed to adequately articulate the bases for the weight given to two medical opinions and some of the bases cited by the ALJ are not supported by the record. Therefore, this Court is unable to conclude that the ALJ's decision was supported by substantial evidence. Accordingly, the ALJ's decision is **REVERSED** and **REMANDED**.

**I. Procedural History**

King protectively applied[1] for disability insurance benefits on July 5, 2012. Tr. 28, 96, 105. She protectively applied for supplemental security income on July 6, 2012. Tr. 28, 86, 106.

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application." http://www.socialsecurity.gov/agency/glossary/ (last visited 7/7/2016).

1

In both applications, King reported a disability onset date of June 1, 2006, due to bipolar disorder, manic-depressive disorder, and post-traumatic stress disorder.  Tr. 86, 96.  Both applications were initially denied and then denied again on reconsideration.  Tr. 106–107, 126–127, 132–137, 143–153.

After a hearing (Tr. 42–69), ALJ Penny Loucas issued a decision (Tr. 25–41) on December 27, 2013, concluding that King had not been disabled within the meaning of the Social Security Act (Tr. 28).  On April 10, 2015, the Appeals Council denied King's request for a review of the ALJ's decision, making it the final decision of the Commissioner.  Tr. 1–7.

## II. Evidence

### A.   Personal, educational and vocational evidence

King was born in 1984.  Tr. 200.  She spent most of her life in Tennessee and moved to Ohio in June 2012.  At the time of the hearing, she was 29 years old (Tr. 44), single and living with her 21-month-old daughter at the home of her brother's girlfriend's daughter (Tr. 52–53).[2] She has a GED and her employment history includes limited experience working as a cashier and doing restaurant work.  Tr. 228.

### B.   Medical evidence

#### 1.   Treatment history

King's medical records go back to July 2003 when King was living in Tennessee and was referred to Centerstone Research Institute ("Centerstone") for depression.  Tr. 798–804.  Although she was referred for long-term treatment, her attendance was spotty.  The record reflects another two visits in February 2004 when she sought help with two objectives: managing her illnesses and finding employment.  Tr. 648, 788–97.  The record indicates she met with a

---

[2] King has five other children.  Three have been given up for adoption and two reside with their paternal aunt.  Tr. 542.

case worker in April 2004 when she reported doing well with her job but having difficulty securing transportation. Tr. 640–41.

There is no indication of any further interaction with Centerstone for nearly two years. King returned in March 2006 seeking help treating and managing her illnesses, reporting that she had been having problems sleeping and she had been having auditory and visual hallucinations. Tr. 637. A month later, on April 14, 2006, during a psychiatric evaluation at Centerstone, there were reports of past suicidal thoughts/attempts, increased depression, decreased motivation, hallucinations, and cutting on the arms superficially to release emotions. Tr. 845. King's diagnoses during that evaluation included polysubstance dependence and dysthymic disorder, early onset with atypical features, and her GAF score was 31.[3] Tr. 845–852. King met with Centerstone staff twice more over the next two months. In May, she reported some improvement of her symptoms in a follow-up visit. Tr. 633–35.

Two weeks later, though, she was admitted to the psychiatric unit at Vanderbilt University Medical Center after attempting suicide. Tr. 628–30. She reported heavy alcohol use and recent cocaine use consistent with her previous diagnoses of polysubstance dependence. She said she was struggling with depression and had difficulty concentrating, reduced memory, reduced appetite, auditory and visual hallucinations, racing thoughts, and feeling panicky. Tr. 628. Doctors there noted that she had previously attempted to kill herself by jumping out of a moving car. Tr. 628. Upon discharge three days later, doctors diagnosed her with alcohol and

---

[3] GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses. *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34. A GAF score between 31 and 40 indicates "some impairment in reality testing or communication (e.g., speech at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." *Id.*

3

cocaine dependence, and mood disorder, not otherwise specified, and they assigned her a GAF score of 55 to 57.[4]  Tr. 630.  King went back to Centerstone in August 2006; she was diagnosed again with polysubstance dependence and dysthymic disorder, early onset with atypical features, as well as major depressive disorder, single episode, severe with psychotic features.  Tr. 707–10.  She was assigned a GAF score of 31.  Tr. 707.

King began a more regular course of treatment for her illnesses in April 2007, when she checked herself in to the Lloyd C. Elam Mental Health Center ("Elam") for alcohol dependence and bipolar disorder, not otherwise specified.  Tr. 619.  Doctors there noted a reported history of depression, sexual and emotional abuse, and auditory and visual hallucinations.  Tr. 769–78.  King also reported that she regularly struggled with mood swings, racing thoughts, anxiety, and extreme anger.  Tr. 620, 769.  After two months, she was discharged with diagnoses of alcohol dependence and bipolar disorder, not otherwise specified; her GAF score was 55.  Tr. 619.

During her treatment at Elam, King was referred to Centerstone where she began seeing Dr. Hal Schofield M.D. ("Schofield") and a variety of others to help her manage her illnesses.  Tr. 853–59.  In May 2007, Schofield's diagnoses included post-traumatic stress disorder, chronic; sexual abuse of a child; cocaine abuse and alcohol abuse.  Tr. 859.  He noted a GAF score of 45.[5]  Tr. 853.  In July 2007, Schofield added dysthymic disorder, early onset with atypical features to the diagnosis.  Tr. 693–695.  King's diagnoses and GAF score were unchanged in September 2007.  Tr. 685–687.  A Centerstone Client Termination Report from

---

[4] A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id.*

[5] A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)."  *Id.*

January 2008 indicated that King's compliance with her treatment had been inconsistent and that she had made an unknown amount of progress in treatment. Tr. 735.

Medical records for the next three years do not indicate any continued treatment for King's previously diagnosed illnesses, though she had numerous visits to the emergency room for allergic rhinitis (Tr. 290–91), foot pain (Tr. 292–94), alcohol intoxication (Tr. 295–300), foot and vaginal pain (Tr. 301–05), headaches (Tr. 306–08), a cough and sinus problems (Tr. 319–326), complications with her pregnancy (Tr. 327–41), sexual assault (Tr. 342–49), pelvic pain and vaginal bleeding (Tr. 350–59), migraines (Tr. 360–65), abdominal pain (Tr. 366–70), a sore throat (Tr. 371–75), and suicidal thoughts (Tr. 376–88).

King was readmitted to Elam in May 2010 for cocaine dependence and bipolar disorder, not otherwise specified, and again referred to Centerstone before she was discharged on July 5, having "met all goals." Tr. 610–12. King appears to have continued her treatment at Centerstone for eight months. Her doctors, social workers and case managers noted gradual improvement in her symptoms and compliance over the remainder of the year. Tr. 936–979. Early in 2011, King reported to her social worker that she had relapsed. Tr. 934. Weeks later, she was taken to the emergency room after passing out in the middle of the street. Tr. 425–436. Doctors diagnosed her with acute alcohol intoxication, altered mental status and suicidal ideation. Tr. 435. Weeks later, she was diagnosed at Centerstone with bipolar I disorder, most recent episode mixed, severe with psychotic features; polysubstance dependence; and post-traumatic stress disorder, chronic, with a GAF score of 45. Tr. 928–929.

King stopped her treatment with Centerstone for several months, during which she again made several visits to the emergency room, being treated for a cough (Tr. 445–51), a suicide attempt (Tr. 452–63), a sore throat (Tr. 464–68) and a toothache (Tr. 469–470).

5

King returned to Centerstone to resume treatment in October 2011, reporting mental and physical exhaustion. Tr. 489–98. King said she was looking for help to "function to the fullest." Tr. 494. Centerstone noted that she was reporting auditory hallucinations, and rated her mood as "anxious, depressed" and her insight as "fair." Tr. 494–95. She was diagnosed with polysubstance dependence and bipolar I disorder, most recent episode mixed, severe with psychotic features. Tr. 496. A week later, Centerstone recommended that she be partially hospitalized, but King declined, citing concerns about interference with her ongoing outpatient drug and alcohol rehabilitation program and fears of being in a setting that feels too institutional. Tr. 539. Throughout her treatment at Centerstone, which included at least 12 visits over the seven months before she moved to Ohio in June 2012, she consistently reported depression, hallucinations, paranoia, panic attacks, racing thoughts, and anxiety. Tr. 489–540, 882–907. On April 23, 2012, her final diagnosis from Centerstone indicated polysubstance dependence and bipolar I disorder, most recent episode mixed, severe with psychotic features, and a GAF score of 45. Tr. 518–520. On May 31, 2012, she reported to her social worker that she had relapsed on alcohol and drugs, and was in treatment at Elam. Tr. 871.

King moved to Ohio in June 2012. Tr. 542. After arriving, she sought treatment with Signature Health ("Signature") on July 19, 2012, reporting racing thoughts, hallucinations, and worsening symptoms since she ran out of medication. Tr. 542. Her initial psychiatric evaluation at Signature was with Dr. Manish Aggarwal, M.D., on August 11, 2012. Tr. 549–55. Dr. Aggarwal diagnosed King with bipolar disorder, rapid cycling with psychotic symptoms; post-traumatic stress disorder; rule-out obsessive compulsive disorder; cocaine abuse, not otherwise specified; and alcohol abuse, not otherwise specified. Tr. 554. He gave her a GAF score of 50 to 60. Tr. 554. King's symptoms ebbed and flowed as she continued to see Dr. Aggarwal over

6

the next five months, with visits on September 1 (Tr. 556–59), September 15 (Tr. 560–62), October 13 (Tr. 585–88), November 10 (Tr. 589–91), December 8 (Tr. 592–94), January 12 (Tr. 595–98), and February 9 (Tr. 599–601).  Dr. Aggarwal's final diagnosis was major depressive disorder; generalized anxiety disorder; post-traumatic stress disorder; cocaine abuse, not otherwise specified; and alcohol abuse, not otherwise specified, with a GAF score of 50 to 60. Tr. 600.  Dr. Aggarwal also noted that, because he was unable to find any explanation for the ongoing reports of hallucinations, he ordered an on-the-spot urine test to rule out ongoing drug use.  Tr. 597.  Notes from King's next visit indicate that the test came back negative and King was referred to a neurologist.  Tr. 601.

In April 2013, King returned to Signature and saw nurse practitioner Julie Stone, who said King reported increased depression and continued hallucinations.  Tr. 602–04.  In May, she reported continued depression, anxiety and hallucinations, but said her irritability and mood swings were decreasing.  Tr. 605.

In August 2013, King began seeing nurse practitioner Rachael Martin.  Tr. 565–68.  King reported that she had gone off her medication and was suffering from increased depression, suicidal thoughts, anger, frustration, irritability, and continuing hallucinations.  Tr. 565.  Nurse Martin noted that King was irritable and hopeless and that she had a depressed mood.  Tr. 566. Nurse Martin gave King a GAF score of 40.  Tr. 567.  On September 11, 2013, King saw Nurse Martin again and reported continued depressive symptoms, sleep problems, anxiety, hallucinations and panic attacks.  Tr. 569.  Nurse Martin noted that King was alert and oriented, and noted no abnormal findings regarding her level of consciousness.  Tr. 569.  At King's request, Nurse Martin completed an assessment for Social Security purposes, also dated September 11.  Tr. 569.

7

In October, King began reporting rage and occasional homicidal thoughts in addition to low energy, anxiety, panic attacks, racing thoughts, hallucinations and feelings of hopelessness, helplessness and worthlessness. Tr. 998. King reported similar symptoms in December 2013.[6] Tr. 1006.

### 2. Medical opinions

On September 11, 2013, Nurse Martin completed a "Physician Questionnaire (Psychological)." Tr. 563–64. Asked for King's symptoms, Nurse Martin listed "depressed, low energy, helpless, hopelessness, feelings [of] worthlessness, insomnia, irritability, hyperarousal, nightmares, racing thoughts, panic attacks, visual/auditory hallucinations occasionally." Tr. 563. She said that King would be unable to sustain eight-hour workdays five days a week, citing her "lack of sleep, irritability, lack of concentration/attention" and concluding that such a schedule would interfere with her treatment. Tr. 563. Nurse Martin concluded that King's panic attacks, which occurred one to two times each day, would interfere with her attention, concentration, and ability to perform simple tasks. Tr. 564. Nurse Martin also opined that due to "ongoing psychosocial stressors," King could not commit to reliable decision-making, consistent attendance, or maintaining a regular schedule. Tr. 564.

On August 17, 2012, state agency reviewing psychologist Karla Voyten, Ph.D., completed a Psychiatric Review Technique ("PRT") and Mental RFC Assessment. Tr. 90–93, 100–103. In the PRT, Dr. Voyten opined that King's affective disorder and substance addiction were severe and resulted in mild restrictions on her activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace, but no repeated episodes of decompensation. Tr. 91, 101. In the Mental

---

[6] Evidence submitted after the administrative hearing indicates that King continued regular treatment with Nurse Martin at least through July 2014. Tr. 8-24.

8

RFC Assessment, Dr. Voyten opined that King had no limitations with respect to memory and understanding.  Tr. 92, 102.  Dr. Voyten concluded that King's ability to carry out detailed instructions, to maintain attention and concentration for extended periods, to complete a normal workday or work week without interruptions from her symptoms, and to perform at a consistent pace were moderately limited.  Tr. 92, 102.  Dr. Voyten concluded that there would be no significant limitations on King's ability to carry out very short and simple instructions, to perform activities within a schedule, to maintain regular attendance, to be punctual within customary tolerances, to sustain an ordinary routine without special supervision, to work in coordination with or in proximity to others without being distracted by them, or to make simple, work-related decisions.  Tr. 92, 102.  Dr. Voyten said King had no limitations on social interaction.  Tr. 93, 103.  She said King had adaptation limitations due to "reduced" coping skills, finding that her ability to respond appropriately to changes in the work setting would be moderately limited, though she saw no significant limitations in her awareness of normal hazards, her ability to travel to unfamiliar places, her ability to use public transportation, set realistic goals or make plans independently of others.  Tr. 93, 103.  Dr. Voyten said that King's depressive symptoms would "impact her stress tolerance and ability to complete detailed work," and she said King could perform tasks involving three to four steps.  Tr. 92, 102.

On reconsideration, state agency reviewing psychologist Frank Orosz, Ph.D., reached the same conclusions.  Tr. 112–13, 120–23.  Dr. Orosz said, "[King's] depressive [symptoms] impact her stress tolerance and ability to complete detailed work.  She is capable of completing 3–4 step tasks."  Tr. 122.

State agency reviewing physician Dr. Esberdado Villanueva, M.D., provided a "Case Analysis."  Tr. 111, 119.  He noted that King had been seen twice in 2012 for an ankle sprain and

9

said that the injury "did not meet duration requirements." Tr. 111, 119. He noted that King was not alleging any physical impairment and that the "evidence does not show a severe physical MDI."[7] Tr. 111, 119.

## C. Testimonial evidence

### 1. King's testimony

King was represented and testified at the administrative hearing. Tr. 44–64. The ALJ began her inquiry by questioning King's attorney about her claims of post-traumatic stress disorder, noting that the first psychiatric evaluation in the record found that she did not meet the criteria. Tr. 46. The ALJ also questioned King's reports that she was the victim of sexual abuse, noting that she had mentioned the abuse to her doctor during a 2006 psychiatric evaluation prompted by a suicide attempt. Tr. 47–48. The ALJ next asked King about her criminal history. Tr. 48–49. King said that she had served jail time after getting involved with a friend's check-forging scheme. Tr. 49. She reported that she was also convicted of assaulting her cousin's wife with a knife and had cut off an ankle bracelet that she had been required to wear. Tr. 49.

The ALJ next asked about King's treatment for substance abuse and psychiatric disorders. Tr. 49. King said she had been treated by Centerstone for 45 days in 2010, and that, as of the hearing date, she had been sober for 17 months. Tr. 50–51. While King gave up her first five children, she said that the 21-month-old daughter she was then caring for was her inspiration for maintaining her sobriety. Tr. 52.

The ALJ also inquired into King's work history. King said that she had worked part-time at a grocery store in 2003, part-time at a restaurant in 2005, and then part-time at a gas station.

---

[7] MDI means "medically determinable impairment" and refers to "an impairment that results from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." *Stokes v. Comm'r of Soc. Sec.*, No. 5:12-CV-1449 LEK, 2014 WL 4346427, at *7 (N.D.N.Y. Sept. 2, 2014)

10

Tr. 53–54. Asked why she believes she can no longer work, King said that she has auditory and visual hallucinations and racing thoughts on a daily basis, and that they are "consistent and . . . very aggravating and irritating." Tr. 54. She said they interfere with her sleep, her daily tasks and caring for her daughter. Tr. 54. She also said she has feelings of anger, irritability and rage. Tr. 56–57. King said that for a couple of hours each day, she cannot care for her daughter due to her symptoms and has to have someone else to look after her daughter so she can sit in another room alone. Tr. 55–57. The ALJ asked whether she had reported this particular behavior to her therapist; King said she had not, but that she had disclosed both the symptoms and the fact that she has people helping her with child care. Tr. 55–56.

King said she was working with medical and psychological professionals to manage her symptoms and described her prescription regimen, which was still being adjusted to address side effects, including drowsiness. Tr. 57–59. She said that her medication was helping her to fall asleep, but that she has trouble staying asleep and usually only gets one to three hours of sleep a night. Tr. 59. She said she has trouble completing chores, watching television, and handling other activities because of racing thoughts, anxiety and panic attacks. Tr. 59–60. She said she has trouble dealing with other people because she doesn't know what to expect from their personalities and gets angry if she feels criticized, leading to arguments, cursing, and, on one occasion, stabbing her cousin's wife. Tr. 61.

### 2. Vocational Expert's testimony

The ALJ asked Vocational Expert ("VE") Tom Nimberger to assume a hypothetical individual similar to King in age, education and work history, with no limits on exertion, memory or social interaction, who can maintain concentration, persistence and pace doing routine work for two-hour blocks of time over a normal, eight-hour workday and 40-hour week. Tr. 64. The ALJ asked whether such a person would be able to find any work, and the VE said

11

that such a person could find work in medium, unskilled jobs, such as laundry worker or kitchen helper, or in light, unskilled jobs such as packager.[8] Tr. 64–65. The ALJ asked the VE whether those opportunities would be different if the hypothetical person were "off task" for any reason for 10 percent of the day, and he said the jobs identified would not change. Tr. 65. The VE testified that, if the time off task reached 20 percent of the day, the person could not sustain employment. Tr. 67. He said he could not offer an opinion as to someone who was off task for an amount of time between 10 and 20 percent. Tr. 67–68. The VE also testified that such a person who was consistently absent from work at least twice a month would not be employable. Tr. 68.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[9] . . . .

42 U.S.C. § 423(d)(2)(A).

---

[8] The VE provided local and national job incidence numbers for each of the identified jobs. Tr. 64-65.

[9] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[10] claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[11] *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

---

[10] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. 20 C.F.R. § 416.925.

[11] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

### IV. The ALJ's Decision

In her December 27, 2013, opinion, the ALJ made the following findings:[12]

1. King met the insured status requirements of the Social Security Act through December 31, 2006. Tr. 30.

2. King had not engaged in substantial gainful activity since the alleged onset date of June 1, 2006. Tr. 30.

3. King suffered from two severe impairments: bipolar disorder and post-traumatic stress disorder. Tr. 30.

4. King's impairments did not meet or medically equal the severity of any listed impairment. Tr. 30–31.

5. King had the residual functional capacity to perform a full range of work at all exertional levels, had no limits on memory or interacting with others, and was able to maintain concentration, persistence and pace for two-hour blocks of time over a normal, eight-hour day and 40-hour week doing work that is routine in nature. Tr. 32–36.

6. King had no past relevant work. Tr. 36.

7. King was born in 1984 and was 21 years old, which is defined as a younger individual age 18–49, on the date the application was filed. Tr. 36.

8. King had a limited education and was able to communicate in English. Tr. 36.

9. King's lack of past relevant work rendered transferability of job skills a non-issue. Tr. 36.

10. Given her age, education, work experience and residual functional capacity, King could perform several jobs that exist in significant numbers in the national economy, including laundry worker, kitchen helper/dishwasher and packager. Tr. 36–37.

Based on the foregoing, the ALJ concluded that King had not been under a disability, as defined in the Social Security Act, from June 1, 2006, through the date of the decision. Tr. 37.

---

[12] The ALJ's findings are summarized herein.

14

## V. Parties' Arguments

King argues that the ALJ erred by finding that King's mental impairments do not meet the requirements of a listed impairment.  Doc 15, pp. 14–16.  King also argues that the ALJ erred by failing to fully and fairly evaluate the limitations resulting from those impairments (Doc. 15, pp. 16–19).  In arguing that the ALJ did not fully and fairly assess King's limitations, King challenges the ALJ's credibility assessment and weighing of one of the state agency reviewers' opinions and Nurse Martin's opinion.  Doc 15, pp. 16–19.

In response, the Commissioner argues that the ALJ reasonably concluded that King's mental impairments did not meet the requirements of a listed impairment (Doc 20, pp. 12–17) and that substantial evidence supports the ALJ's assessed mental RFC and the weight accorded by the ALJ to the medical opinions (Doc 20, pp.17–19).

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42

U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A. The ALJ failed to adequately articulate the basis for the weight given to Nurse Martin's opinion.

King alleges that the ALJ improperly discounted the opinion of nurse practitioner Rachael Martin for reasons not supported by the record.

"[A]n ALJ has discretion to determine the proper weight to accord opinions from 'other sources' such as nurse practitioners." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525 at 530 (6th Cir. 1997)). Although such opinions are not entitled to any special deference, an ALJ is generally required to explain the weight given to them. *Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 550 (6th Cir. 2014). In doing so, the ALJ must "ensure that the discussion of the evidence . . . allows a claimant or subsequent reviewer to follow the adjudicator's reasoning." SSR 06-03p, 2006 WL 2329939, at *6.

The ALJ offered four reasons for giving "little weight" to Nurse Martin's opinion. Tr. 35. First, she noted that Nurse Martin had seen King only twice and characterized the assessment form as being filled out "only to the best of her knowledge." Tr. 35. Second, the ALJ discounted Nurse Martin's opinion because it relied on King's reports of panic attacks, which the ALJ found were "not consistent with the record." Tr. 35. Third, the ALJ gave Nurse Martin's opinion less credit because it did not discuss King's substance abuse or its effects. Tr.

16

35. Fourth, the ALJ found that Nurse Martin's notes were internally inconsistent and inconsistent with notes from Dr. Aggarwal. Tr. 35.

Other than the fact that Nurse Martin saw King only twice before offering an opinion, the ALJ's reasons for discounting Nurse Martin's opinions are not sufficiently explained and/or are not supported by the evidence. For example, Nurse Martin's opinion did not omit any mention of substance abuse; it noted that King's abuse of alcohol and cocaine was in remission. Tr. 563. Nor is it clear where the ALJ found the inconsistencies used to discredit Nurse Martin. For example, while the ALJ characterized the report of panic attacks as inconsistent with the record, she did not point to anything that actually undermined that report. In fact, reports of panic attacks go back at least to 2006 (Tr. 628) and appear elsewhere throughout the record (Tr. 537, 539, 569, 998, 1002, 1006). The ALJ further discredited Nurse Martin for "inconsistencies within her own notes," but pointed only to differences between King's self-reported symptoms and Nurse Martin's objective findings, which need not be consistent with each other. And even those two sets of statements are not truly inconsistent when viewed as a whole. In support, the ALJ had quoted Nurse Martin as making the following findings on August 14, 2013:

> friendly co-operative, alert, consistent eye contact, good hygiene, grooming and responsive—no abnormal movements; pleasant open attitude—no anxiety—clear coherent speech; attention and concentration sufficient; memory intact; judgment insight and abstract thoughts intact and adequate.

Tr. 35. The language quoted by the ALJ is incomplete; it omits several of Nurse Martin's other findings contained within the same set of notes, including that King had a blunted affect and an "irritable, hopeless, depressed mood." Tr. 566. The ALJ also concluded that Nurse Martin's report was inconsistent with prior mental examination findings, noting that, during a regular visit a year earlier, Dr. Aggarwal had found King to be in a good mood and enjoying fewer depressive symptoms. Tr. 35. Given the ALJ's finding that King suffers from bipolar disorder, it is unclear

17

why it would be inconsistent to find that King's mood was up in September 2012 but down in September 2013.

While the duration of Martin's relationship with King may be grounds to discount her opinion, the other reasons are not supported and/or not fully explained. It is unclear to what extent the ALJ reduced the weight she accorded to Nurse Martin's opinion due to these additional, unsupported considerations. Accordingly, the Court is left to speculate and is unable to conclude that the ALJ's decision to give little weight to Nurse Martin's opinion is supported by substantial evidence. The incorrect assumptions and factual findings underlying the ALJ's assessment of Nurse Martin's opinion also leave the Court unable to assess the ALJ's credibility findings or Step Three analysis.

**B.     The ALJ failed to adequately articulate the basis for the weight given to Dr. Villanueva's opinion.**

The ALJ gave "considerable weight" to what the ALJ described as Dr. Villanueva's opinion that "the claimant did not have any severe mental impairments for the period of June 1, 2006 to the present." Tr. 35. King argues that the ALJ did not properly evaluate Dr. Villanueva's opinion and that his opinion does not support the ALJ's assessment of her RFC. Doc. 15, p. 18.

"An ALJ may consider the opinion of nonexamining medical sources, such as State agency medical and psychological consultants, in determining whether the claimant is disabled." *Winning v. Comm'r of Soc. Sec.*, 661 F. Supp. 2d 807, 819 (N.D. Ohio 2009). Unless the ALJ gives controlling weight to a treating source, which did not happen here, the ALJ must explain in the decision the weight accorded to the opinions of a state agency medical or psychological consultant. *Id.* That explanation must allow a reviewing court "to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." *Id.*

Here, the reviewing court is not able to follow the ALJ's reasoning in affording Dr. Villanueva's opinion "considerable weight." The ALJ gave the opinion more weight than any other in evaluating King's mental impairments. While the ALJ says that Dr. Villanueva "opined that the claimant did not have any severe mental impairments" (Tr. 35), Dr. Villanueva in fact did not address mental impairments at all; his opinion dealt with an ankle sprain (Tr. 111, 119). While his opinion includes a line that says "No severe MDI," his detailed notes make clear that he was looking for physical impairments, focusing on King's emergency room trips for a twisted ankle. Tr. 111, 119. The Commissioner notes that Dr. Villanueva's report includes a statement that King reported being disabled as of December 31, 2006, and that there was insufficient evidence to determine how those conditions affected her ability to work before that date. Tr. 115. But neither of those statements is the same as saying that King has no severe mental impairment. In fact, by signing the overall Disability Determination Explanation, Dr. Villanueva appears to have accepted Dr. Orosz's findings that King had two severe mental impairments. Tr. 125. Furthermore, the ALJ called Dr. Villanueva's opinion an "objective review of the evidence" and gave it great weight, but then noted that the record of King's bipolar disorder and post-traumatic stress disorder contradicted Dr. Villanueva's findings. Tr. 35.

As King argues, Dr. Villanueva's assessment does not support the ALJ's determination. The Commissioner argues that the ALJ may have instead simply made a harmless scrivener's error, confusing Dr. Villanueva with Dr. Orosz. Doc. 20, p. 20. This does not appear to be the case, either. The ALJ made a separate determination regarding Dr. Orosz's opinion, which she gave only "some weight." Tr. 35. Moreover, Dr. Orosz did not reach the conclusions that the Commissioner is now trying to ascribe to him; rather, he opined that King did suffer from multiple severe mental impairments. Tr. 112, 120.

19

Given these discrepancies, the ALJ has not sufficiently explained the weight given to Dr. Villanueva's opinion. To the extent that the ALJ's decision to give his findings "considerable weight" influenced other findings in the decision, they must be re-evaluated.

**C.     Other issues.**

King argues that the ALJ improperly discredited King (Doc. 15, p. 16–18) and that the ALJ erred at Step Three, arguing that the ALJ's decision was not supported by substantial evidence with respect to its determination that she had only mild difficulties with social functioning (Doc. 15, p. 15) and moderate difficulties in maintaining concentration, persistence or pace (Doc. 15, p. 16).

This Opinion does not address King's additional arguments because, on remand, the ALJ's further evaluation of the medical opinion evidence may have an impact on her findings with respect to King's credibility and the Step Three analysis. See e.g. *Trent v. Astrue*, Case No. 1:09CV2680, 2011 U.S. Dist. LEXIS 23331, at *19, 2011 WL 841538 (declining to address the plaintiff's remaining assertion of error because remand was already required and, on remand, the ALJ's application of the treating physician rule might impact his findings under the sequential disability evaluation).

## VII. Conclusion

For the reasons set forth herein, the Commissioner's decision is **REVERSED** and **REMANDED** for further proceedings consistent with this opinion.[13]

July 7, 2016

Kathleen B. Burke
United States Magistrate Judge

---

[13] This Opinion should not be construed as requiring a determination that King is in fact disabled.